**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER FRITZ, derivatively on behalf of SOUNDHOUND AI, INC., <br><br> Plaintiff, <br><br> v. <br><br> KEYVAN MOHAJER, NITESH SHARAN, JAMES HOM, DIANA SROKA, ERIC R. BALL, and LARRY MARCUS, <br><br> Defendants, <br><br> and <br><br> SOUNDHOUND AI, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff Walter Fritz ("Plaintiff"), by and through his undersigned attorneys, brings this Verified Shareholder Derivative Complaint, for the benefit of Nominal Defendant SoundHound AI, Inc. ("SoundHound" or the "Company"), against Defendants Keyvan Mohajer ("Mohajer"), Nitesh Sharan ("Sharan"), James Hom ("Hom"), Diana Sroka ("Sroka"), Eric R. Ball ("Ball"), and Larry Marcus ("Marcus") (collectively, the "Individual Defendants" and with SoundHound,

1

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"Defendants"), to remedy the Individual Defendants' breaches of fiduciary duties and violations of federal law as contained herein.

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, based on the investigation of Plaintiff's counsel, including a review of publicly available information, filings by SoundHound with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits including the securities class action *St. John Family Trust, et al., v. SoundHound AI, Inc., et al.,* No. 3:25-cv-02915-RFL (N.D. Cal.) (the "Securities Class Action"), and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought on behalf of SoundHound against certain current and former officers and members of the Company's Board of Directors (the "Board") for breaches of their fiduciary duties and violations of the federal securities laws committed between March 1, 2024 and March 11, 2025, both dates inclusive (the "Relevant Period").

2.    SoundHound is a technology company that specializes in music identification, voice recognition, and natural language processing. In 2009, the Company launched its flagship product, the SoundHound mobile application, which allows users to identify songs playing around them. The Company began to expand into voice recognition and natural language processing in 2015, with the launch of its Houndify Voice AI platform.

3.    In the years that followed, SoundHound entered into key partnerships with automotive manufacturers, smart home device manufacturers, retail companies, and telecommunications companies to incorporate voice recognition technology into their products and services.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

4.    In 2024, SoundHound acquired SYNQ3, a company which provides voice ordering systems in the food and beverage industry (the "SYNQ3 Acquisition"), and Amelia Holdings, Inc., a conversational AI platform (the "Amelia Acquisition" and, with the SYNQ3 Acquisition, the "Acquisitions"). In a press release issued by SoundHound on February 27, 2025, the Company touted the Acquisitions as contributing to its "breakthrough year" in 2024, "expanding [its] leadership position in voice and conversational AI."

5.    Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company failed to effectively address material deficiencies in its internal controls over financial reporting; (ii) the material deficiencies in the Company's internal controls hindered SoundHound's ability to account for complex transactions, including the Acquisitions; (iii) the Company's reported goodwill was materially inflated following the Amelia Acquisition; and (iv) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

6.    On March 4, 2025, SoundHound announced that it would be unable to timely file its 2024 annual report on Form 10-K (the "2024 10-K"), explaining that, "[d]ue to the complexity of accounting for the Acquisitions, the Company requires additional time to prepare the financial statements and the accompanying notes disclosed in the Company's Annual Report."

7.    On this news, the price of SoundHound's stock declined approximately 4%, from a close of $10.12 per share on March 3, 2025 to a close of $9.72 per share on March 4, 2025.

8.    On March 11, 2025, the Company filed its 2024 10-K, which disclosed that material weaknesses in SoundHound's internal controls hampered its ability to account for "complex financing transactions and acquisitions."

9.    The Company additionally disclosed that, due to the material weaknesses in its internal controls, it had "recorded adjustments to correct certain errors in the preliminary purchase price allocation that existed as of [August 6, 2024 (the "Amelia Acquisition Date")]," which

3
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"decreased the contingent earnout consideration by \$5.3 million, decreased the accounts payable by \$3.7 million, decreased the accrued liabilities by \$1.2 million, increased deferred revenue by \$0.3 million and increased the deferred tax liabilities by \$0.7 million" and "[a]s a result of the adjusted [Amelia Acquisition Date] fair value of contingent earnout consideration recognized, assets acquired and liabilities assumed, we recorded a decrease of \$9.3 million to the goodwill recognized."

10. As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

11. On June 22, 2026, Plaintiff, through Plaintiff's counsel, served a demand on SoundHound's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing SoundHound to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as Exhibit A.

## **JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15. Additionally, diversity jurisdiction is conferred pursuant to 28 U.S.C. § 1332 as there is complete diversity between the Plaintiff and the Defendants. Plaintiff and Defendants are

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 27(a) of the Exchange Act because SoundHound is headquartered in this District, Defendants have conducted business and received compensation in this District, Defendants' actions have had an effect in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## **PARTIES**

17.    Plaintiff is, and has been, a continuous shareholder of SoundHound at all relevant times. Plaintiff is a citizen of Texas.

18.    Nominal Defendant SoundHound is a Delaware corporation with its principal executive offices located at 5400 Betsy Ross Drive, Santa Clara, California 95054. SoundHound's common stock trades on Nasdaq under the ticker symbol "SOUN."

19.    Defendant Mohajer co-founded SoundHound and has served as its Chief Executive Officer and as a member of the Board since its inception in 2005. According to the proxy statement filed on April 9, 2026 (the "2026 Proxy Statement"), as of March 30, 2026, Defendant Mohajer beneficially owned 761,277 shares of SoundHound Class A Common Stock and 14,139,064 shares of SoundHound Class B Common Stock, giving him 19.8% of the Company's total voting power. Upon information and belief, Defendant Mohajer is a citizen of California.

20.    Defendant Hom co-founded SoundHound, along with Defendant Mohajer, and has served as Chief Product Officer ("CPO") since April 2022 and as a member of the Board since 2006. Prior to serving as CPO, Defendant Hom served as Vice President of Products from 2006 until April 2022. According to the 2026 Proxy Statement, as of March 30, 2026, Defendant Hom beneficially owned 401,530 shares of SoundHound Class A Common Stock and 1,812,588 shares of SoundHound Class B Common Stock, giving him 2.6% of the Company's total voting power. Upon information and belief, Defendant Hom is a citizen of California.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

21.    Defendant Sroka has served as a member of the Board since April 2022 and serves as a member of the Audit Committee. According to the 2026 Proxy Statement, as of March 30, 2026, Defendant Sroka beneficially owned 234,605 shares of SoundHound Class A Common Stock. Upon information and belief, Defendant Sroka is a citizen of California.

22.    Defendant Ball has served as a member of the Board since March 2021 and serves as Chair of the Audit Committee. According to the 2026 Proxy Statement, as of March 30, 2026, Defendant Ball beneficially owned 543,741 shares of SoundHound Class A Common Stock. Upon information and belief, Defendant Ball is a citizen of California.

23.    Defendant Marcus has served as a member of the Board since 2009 and serves as a member of the Audit Committee. According to the 2026 Proxy Statement, as of March 30, 2026, Defendant Marcus beneficially owned 200,054 shares of SoundHound Class A Common Stock. Upon information and belief, Defendant Marcus is a citizen of California.

24.    Defendant Sharan served as SoundHound's Chief Financial Officer ("CFO") from 2021 until his resignation effective April 3, 2026. According to the 2026 Proxy Statement, as of March 30, 2026, Defendant Sharan beneficially owned 1,230,631 shares of SoundHound Class A Common Stock. Upon information and belief, Defendant Sharan is a citizen of Oregon.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

25.    By reason of their positions as officers, directors, and/or fiduciaries of SoundHound and because of their ability to control the business and corporate affairs of SoundHound, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

26.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

highest obligations of fair dealing.

27. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

28. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

29. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to SoundHound's own Code of Business Conduct and Ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how SoundHound conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

business and internal affairs of SoundHound and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that SoundHound's publicly disclosed financial information would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

30.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

31.    Each of the Individual Defendants owed to SoundHound and the shareholders the duty of loyalty requiring that each favor SoundHound's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

32. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by SoundHound.

33. At all times relevant hereto, the Individual Defendants were the agents of each other and of SoundHound and at all times acted within the course and scope of such agency.

## **SOUNDHOUND'S CODE OF ETHICS**

34. The Code of Ethics states that its purpose is to:

- promote honest and ethical conduct, including the ethical  handling of actual or apparent conflicts of interest between personal and professional relationships;

- promote the full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC"), as well as in other public communications made by or on behalf of the Company;

- promote compliance with applicable governmental laws, rules, and regulations;

- deter wrongdoing; and

- require prompt internal reporting of breaches of, and accountability for adherence to, this Code.

35. The Code of Ethics applies to "all directors, officers, and employees of the Company," and violations of the Code of Ethics will lead to "disciplinary or preventive action . . . up to and including dismissal or, in the event of criminal or other serious violations of law, notification of the SEC or other appropriate law enforcement authorities."

36. In a section titled "Honest, Ethical and Fair Conduct," the Code of Ethics states, in pertinent part:

- Act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or in the Company's interests.

- Observe all applicable governmental laws, rules, and regulations.

9

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records and other business-related information and data.

- Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices.

* * *

- Protect the assets of the Company and ensure their proper use.

* * *

- Avoid conflicts of interest, wherever possible, except under guidelines or resolutions approved by the Board of Directors (or the appropriate committee of the Board).

37.     In a section titled "Disclosure," the Code of Ethics states:

The Company strives to ensure that the contents of and the disclosures in public communications and in the reports and documents that the Company files with the SEC shall be full, fair, accurate, timely, and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate. Each person must:

- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators, self-regulating organizations, and other governmental officials, as appropriate; and

- in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.

In addition to the foregoing, the Chief Executive Officer and Chief Financial Officer of the Company and each subsidiary of the Company (or persons performing similar functions), and each other person that typically is involved in the financial reporting of the Company must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company.

Each person must promptly bring to the attention of the Chairman of the Audit Committee of the Company's Board of Directors (or the Chairman of the

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's Board of Directors if no Audit Committee exists) any information he or she may have concerning (a) significant deficiencies in the design or operation of internal and/or disclosure controls which could adversely affect the Company's ability to record, process, summarize, and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

It is the Company's obligation and policy to comply with all applicable governmental laws, rules, and regulations. It is the personal responsibility of each person to, and each person must, adhere to the standards and restrictions imposed by those laws, rules, and regulations, including those relating to accounting and auditing matters.

## SOUNDHOUND'S AUDIT COMMITTEE CHARTER

38.    Pursuant to SoundHound's Audit Committee Charter, the purpose of the Audit Committee is:

to assist the Board in monitoring: (1) the integrity of the annual, quarterly, and other financial statements of the Company, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's independent auditor, and (4) the compliance by the Company with legal and regulatory requirements.

39.    In a subsection titled "Financial Statement and Disclosure Matters," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- Meet with the independent auditor prior to the audit to review the scope, planning, and staffing of the audit.

- Review and discuss with management and the independent auditor the annual audited financial statements, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of the Form 10-K).

- Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

11

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Discuss with management and the independent auditor, as appropriate, significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including:

    o any significant changes in the Company's selection or application of accounting principles;

    o the Company's critical accounting policies and practices;

    o all alternative treatments of financial information within GAAP that have been discussed with management and the ramifications of the use of such alternative accounting principles;

    o any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies; and

    o any material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

- Discuss with management the Company's earnings press releases generally, including the use of "pro forma" or "adjusted" non-GAAP information, and any financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be general and include the types of information to be disclosed and the types of presentations to be made.

- Discuss with management and the independent auditor the effect on the Company's financial statements of (i) regulatory and accounting initiatives and (ii) off-balance sheet structures.

- Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

- Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

- Review disclosures made to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer (or individuals performing

12

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

similar functions) during their certification process for the Form 10-K and Form 10-Qs about any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

40. In a subsection titled "Compliance Oversight Responsibilities," the Audit Committee Charter states, in pertinent part, that the Audit Committee shall "[i]nquire and discuss with management the Company's compliance with applicable laws and regulations and with the Company's Code of Ethics in effect at such time, if any, and, where applicable, recommend policies and procedures for future compliance."

41. In the same subsection, the Audit Committee Charter states that the Audit Committee shall "[e]stablish procedures . . . for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or reports which raise material issues regarding the Company's financial statements or accounting policies."

## SUBSTANTIVE ALLEGATIONS

### Background

42. SoundHound is a technology company that specializes in music identification, voice recognition, and natural language processing. In 2009, the Company launched its flagship product, the SoundHound mobile application, which allows users to identify songs playing around them. The Company began to expand into voice recognition and natural language processing in 2015, with the launch of its Houndify Voice AI platform.

43. In the years that followed, SoundHound entered into key partnerships with automotive manufacturers, smart home device manufacturers, retail companies, and telecommunications companies to incorporate voice recognition technology into their products and services.

44. On April 28, 2022, SoundHound went public via merger with a special purpose acquisition company and began trading on the NASDAQ under the ticker symbol "SOUN."

45. In 2024, the Company completed two significant acquisitions in the voice

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

recognition space. Specifically, on January 3, 2024, SoundHound acquired all of the issued and outstanding equity of SYNQ3, a company which provides voice ordering systems in the food and beverage industry, "for total preliminary purchase consideration of $17.0 million," including "$3.9 million in cash paid and 5,755,910 in shares of [SoundHound's] Class A Common stock," additionally agreeing "to pay up to $0.8 million in cash and 1,434,936 in shares of [SoundHound's] Class A Common Stock . . . upon the achievement of specified future milestones."

46.    On August 6, 2024, SoundHound acquired all the capital stock of Amelia Holdings, Inc., a conversational AI platform, for "approximately $80.0 million of consideration, consisting of $10.0 million of cash and 13,084,112 shares of [SoundHound's] Class A Common Stock," additionally agreeing "to issue up to 16,822,429 shares of its Class A Common Stock . . . to the sellers based on the achievement of certain revenue targets for 2025 and 2026."

47.    In a press release issued by SoundHound on February 27, 2025, the Company touted the Acquisitions as contributing to its "breakthrough year" in 2024, "expanding [its] leadership position in voice and conversational AI."

***Materially False and Misleading Statements***

48.    On March 1, 2024, SoundHound filed its Annual Report on Form 10-K for the year ended December 31, 2023 (the "2023 Form 10-K"), signed by Mohajer and Sharan and accompanied by SOX certifications from both executives. In that filing, SoundHound acknowledged material weaknesses in internal control over financial reporting ("ICFR") but represented that, as part of its remediation efforts, the Company had "[c]ompleted a segregation of duties assessment identifying key conflicts and mitigating controls."

49.    On May 9, 2024, SoundHound hosted an earnings call to discuss the Company's first quarter 2024 financial results (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Sharan stated that, "[w]ith our recent acquisitions, SYNQ3, now fully in the mix, the benefits of integrating this pioneering restaurant tech organization with our years of voice AI innovations are clear. And the breadth of coverage we now have in the restaurant sector is so

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

exciting and showing up in overflowing customer activity."

50.    On May 10, 2024, the Company filed a quarterly report on Form 10-Q with the SEC (the "1Q24 10-Q"). The 1Q24 10-Q disclosed material weaknesses in its internal controls over financial reporting "related to the control environment as the Company lacked sufficient oversight of activities related to its internal control over financial reporting due to a lack of appropriate level of experience and training commensurate with its financial reporting requirements," but stated the following with respect to the Company's purported efforts to remediate the deficiencies:

**Management's Plan to Remediate the Material Weaknesses**

The following remediation actions are currently being implemented and are in progress:

• Engaged a third party to perform a risk assessment that includes the identification and walkthrough of key business processes and conducting design and operational control testing to address key risks.

• Completed a segregation of duties assessment identifying key conflicts and mitigating controls.

• Initiated the design and implementation of a Segregation of Duties automated tool for our Enterprise Resource Planning (ERP) system. Additionally, we have initiated the design and implementation of similar controls for the remaining financially relevant applications. Improvements have been implemented in tool utilization to strengthen the segregation of duties.

• Initiated the design and implementation of controls related to the review of Service Organization Control reports, which cover program change management and computer operations for many of the applications that we rely on for financial reporting.

• Developed policies and procedures for the quarterly user access review of all users with access to the financially relevant systems and then implemented the quarterly user access review for one design cycle.

• Initiated the design and implementation of the controls related to review and approval of complex financing transactions.

• Completed the implementation of an automated month and quarter-end

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

accounting close workflow tool to facilitate the review and support of key financial close process controls.

- The Company plans to hire personnel with expertise in internal controls.

51. On August 8, 2024, SoundHound issued a press release titled "SoundHound AI Acquires Amelia, Significantly Expanding its Scale and Reach In Conversational AI Across New Verticals and Hundreds of Enterprise Brands." Therein, the Company stated, in pertinent part:

SoundHound [. . .] today announced the acquisition of Amelia, a leading enterprise AI software company. The business combination positions SoundHound AI as the foremost provider of voice and conversational generative AI, with reach across multiple industries – including retail, financial services, healthcare, automotive, smart devices, restaurants, and more.  The companies will bring together decades of experience in conversational AI – and highly complementary product portfolios – to offer best-in-class, scalable customer service support to a vast spectrum of businesses. These include some of the very largest multinational enterprise brands, top 15 global banks, and Fortune 500 organizations, with the combined company spanning nearly 200 marquee customers.  For SoundHound AI, the deal marks a significant and strategic expansion of its existing customer service pillar, adding breadth and depth to a division that has seen substantial growth amid the accelerated adoption of voice and conversational generative AI solutions. The acquisition positions the company at the center of this burgeoning space, as enterprise spending on generative AI is forecast to gather more momentum, reaching between $175 billion and $250 billion by 2027 (McKinsey, June 2024). Customer service is identified as a key area for disruption.

52. Also on August 8, 2024, the Company issued a press release, announcing its second quarter 2024 financial results, which stated the following, in pertinent part:

"This has been a milestone quarter, with strong customer momentum across all of our key industries – including several new global brands," said [Defendant] Mohajer[.] "And *today we announced a significant acquisition that will expand SoundHound's reach across multiple new enterprise verticals.* We believe the demand for voice and conversational AI is increasing and are committed to strengthening our leadership position in this growing market."

\* \* \*

We continued to realize strong growth in the second quarter while meaningfully improving our capital structure," said [Defendant] Sharan[.] "This is allowing us to further accelerate our organic business *while capitalizing on high-impact*

16

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*M&A. Today's acquisition of Amelia is a key step towards harnessing the huge growth potential in conversational AI and helps us scale even faster."*

53.    During an earnings call, hosted by the Company on the same day (the "2Q24 Earnings Call"), Defendant Mohajer stated, in pertinent part:

Before getting into the quarter, I wanted to talk about the announcement we made this morning to acquire a conversational AI leader, Amelia. This transaction is a natural extension of our strategy, and we saw a great opportunity to partner with a company that we believe will accelerate our mission of voice-enabling the world with conversational intelligence. Our vision has always been to create a conversational AI platform that exceeds human capabilities, delivers value and delights end users, creates an ecosystem with billions of products, and enables innovation and monetization opportunities for product creators. Today's announcement is a continuation of that path and now is the time for such a bold move.

54.    Later during the 2Q24 Earnings Call, Defendant Sharan stated, in pertinent part:

Today, we announced and [Defendant Mohajer] noted earlier, our acquisition of conversational AI leader Amelia. Let me spend a minute explaining how we think about M&A.  First, we believe having a programmatic M&A approach can be value-generating. Our acquisition philosophy stems from our overall strategy and vision, which is to voice-enable the world with conversational intelligence and transform the next wave of how humans will interact with technology, increasingly with voice and natural conversations.

* * *

The primary filters we have been using to select appropriate acquisition targets have been, one, does it fit within our long-term strategy? Two, will it amplify or accelerate our pathway to realize that strategy? Three, can we effectively operationalize it and drive meaningful synergies? And four, can we buy it at the right price, appreciating the risks that inherently come from such transactions? Amelia checked those boxes for us. While it would be a meaningful acquisition with a lot of complementarity, we don't take the integration effort lightly and know it will take sometime to get it right, but the prize together was too attractive to bypass in our opinion, especially with the enterprise traction and demands we have been seeing in the marketplace. We just announced this today, so it's still quite early and we know there will be questions, so please note that we plan to share more and dive much deeper on the opportunity we see.

55.    On August 9, 2024, the Company filed a quarterly report on Form 10-Q with the

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

SEC (the "2Q24 10-Q"), which repeated substantially the same statement regarding the material weakness in SoundHound's internal controls over financial reporting that was contained in the 1Q24 10-Q.

56. During an earnings call hosted by the Company on November 12, 2024 (the "3Q24 Earnings Call"), Defendant Mohajer stated, in pertinent part:

> Moving on to our AI agent customer service portfolio. I'm very pleased with the way we have grown this business over the course of this year, winning new logos organically, expanding with existing customers, growing our ecosystem of partners and making smart acquisitions. We have now expanded our enterprise customer brands deep into some major industries like financial services and healthcare among others. And we see opportunities in our pipeline for new verticals such as energy and going deeper into retail.

57. On November 12, 2024, SoundHound filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2024 (the "3Q24 Form 10-Q"), again signed by Mohajer and Sharan and accompanied by SOX certifications. In that filing, SoundHound repeated its representation that it had "[c]ompleted a segregation of duties assessment identifying key conflicts and mitigating controls."

58. The 3Q24 Form 10-Q also represented that the Company had "[c]ompleted the implementation of an automated month and quarter-end accounting close workflow tool to facilitate the review and support of key financial close process controls."

59. That statement was materially false and misleading. According to confidential witnesses ("CWs"), CW2, who worked in Amelia's accounting organization from March 2018 through the acquisition and remained at SoundHound until March 2025, and CW3, who worked as an Amelia accountant before and after the acquisition, Amelia's accounting processes continued to operate manually after the acquisition.[1] Both witnesses described SoundHound as leaving Amelia's accounting processes largely unchanged rather than integrating Amelia into an

---

[1] Confidential witness allegations discussed herein are drawn from the Amended Class Action Complaint filed on October 1, 2025 in the Securities Class Action. *See Securities Class Action*, ECF No. 56.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

automated close workflow environment. CW3 further stated that Amelia lacked sufficient accounting personnel to close its books, while CW2 described significant deficiencies in review and oversight of accounting entries. These accounts directly undermine SoundHound's representation that it had completed implementation of an automated month-end and quarter-end accounting close workflow tool.

60.    The 3Q24 Form 10-Q also stated that "[t]here were no changes in the Company's internal control over financial reporting. . ." during the quarter ended September 30, 2024 "that materially affected, or are reasonably likely to materially affect," the Company's ICFR. Mohajer and Sharan reinforced that representation through the SOX certifications accompanying the 3Q24 Form 10-Q, in which they certified that they had disclosed any change in SoundHound's ICFR that occurred during the quarter and materially affected, or was reasonably likely to materially affect, the Company's ICFR.

61.    That statement and the related SOX certifications were materially false and misleading. During the quarter, SoundHound completed the Amelia acquisition and began incorporating Amelia's financial reporting into SoundHound's consolidated operations. Yet the 3Q24 Form 10-Q did not disclose that Amelia's accounting processes allegedly remained manual, inadequately staffed, and insufficiently integrated into SoundHound's control environment. The Company later admitted in the 2024 10-K that SoundHound, SYNQ3, and Amelia had not designed and maintained effective controls relating to substantially all accounts and disclosures and lacked effective controls over non-routine and complex transactions, including acquisitions.

62.    Confidential witness allegations further support the conclusion that the Amelia Acquisition materially affected, or was reasonably likely to materially affect, SoundHound's ICFR. CW2 and CW3 described continuing deficiencies in Amelia's accounting function, inadequate staffing, ineffective review controls, and manual close processes. Yet no corresponding disclosure regarding those internal-control changes appeared in the 3Q24 Form 10-Q. Because Mohajer and Sharan were responsible for evaluating ICFR and certifying the accuracy of those disclosures, the circumstances support a strong inference that they knew, or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

were deliberately reckless in not knowing, that the no-change statement and related SOX certifications were misleading.

63.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company had not completed the segregation-of-duties assessment; (ii) following the Amelia Acquisition, Amelia's accounting processes remained manual, inadequately staffed, and insufficiently integrated into SoundHound's control environment; (iii) the Amelia Acquisition materially affected, or was reasonably likely to materially affect, SoundHound's internal control over financial reporting, contrary to the Company's representation that no such changes had occurred during the third quarter of 2024; and (iv) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

64.    On March 4, 2025, the Company filed a notification with the SEC, disclosing that it would be unable to timely file its 2024 10-K. Therein, SoundHound stated, in pertinent part:

> As previously disclosed, on January 3, 2024, SoundHound AI, Inc. (the "Company") completed the acquisition of Synq3, Inc. in a cash and stock transaction (the "SYNQ3 Acquisition"), and on August 7, 2024, the Company completed the acquisition of Amelia Holdings, Inc. in a cash and stock transaction (together with the SYNQ3 Acquisition, the "Acquisitions"). ***Due to the complexity of accounting for the Acquisitions, the Company requires additional time to prepare the financial statements and the accompanying notes disclosed in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "Form 10-K"). Accordingly, the Company has determined that it is unable to file the Form 10-K without unreasonable effort or expense. As previously disclosed, the Company has identified material weaknesses in its internal control over financial reporting. These material weaknesses continue to exist as of December 31, 2024.*** The Company expects to file its Form 10-K within the fifteen-day period provided under Rule 12b-25, no later than by March 18, 2025.

65.    On this news, the price of SoundHound's stock declined almost 4%, from a close of $10.12 per share on March 3, 2025 to a close of $9.72 per share on March 4, 2025.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

66.    On March 11, 2025, the Company filed its 2024 10-K, which disclosed that material weaknesses in SoundHound's internal controls hampered its ability to account for "complex financing transactions and acquisitions." Specifically, the 10-K stated, in pertinent part:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d15(f) under the Securities Exchange Act of 1934, as amended). Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2024. In making this assessment, our management used the criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements may not be prevented or detected on a timely basis. The Company did not maintain an effective control environment as it lacked sufficient oversight of activities related to its internal control over financial reporting due to a lack of appropriate level of experience and training commensurate with its financial reporting requirements. ***Further, due to rapid business growth, changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement to financial reporting, which resulted in the Company, including the SYNQ3 and Amelia entities which were acquired during 2024, not designing and maintaining effective controls related to substantially all accounts and disclosures. These material weaknesses contributed to the following additional material weaknesses as of December 31, 2024:***

***• The Company did not design and maintain effective controls related to the identification of and accounting for certain non-routine, unusual or complex transactions, including the accounting for complex financing transactions and acquisitions.***

67.    Further, with respect to the Amelia Acquisition, the 2024 10-K stated, in pertinent part:

During the year ended December 31, 2024, we recorded measurement period adjustments to increase the cash consideration by $12.8 thousand, to decrease the accounts receivable by $0.2 million, increase the accrued liabilities by $0.9 million due to additional payroll taxes identified, to decrease the non-current income tax liabilities by $1.8 million due to the change of pre-acquisition tax exposures subsequent to the acquisition. As a result of the adjusted acquisition-date fair value of cash consideration, assets acquired and liabilities assumed, we recorded a decrease of $0.7 million to the goodwill recognized. The measurement period adjustments were recorded in the consolidated financial statements as of and for

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the year ended December 31, 2024 and were made to reflect facts and circumstances that existed as of the Amelia Acquisition Date. ***In addition to the measurement period adjustments, we also recorded adjustments to correct certain errors in the preliminary purchase price allocation that existed as of the [Amelia Acquisition Date] during the year ended December 31, 2024, which decreased the contingent earnout consideration by $5.3 million, decreased the accounts payable by $3.7 million, decreased the accrued liabilities by $1.2 million, increased deferred revenue by $0.3 million and increased the deferred tax liabilities by $0.7 million. As a result of the adjusted acquisition-date fair value of contingent earnout consideration recognized, assets acquired and liabilities assumed, we recorded a decrease of $9.3 million to the goodwill recognized.*** The identified error related to the contingent earnout consideration had an immaterial impact to the change in fair value from the acquisition date through September 30, 2024, which would have been recorded in change in fair value of contingent acquisition liabilities in the consolidated statements of operations and comprehensive loss.

68.     These admissions directly contradicted SoundHound's repeated statements in the 2023 Form 10-K, the 1Q24 Form 10-Q, the 2Q24 Form 10-Q, and the 3Q24 Form 10-Q that the Company had completed a segregation-of-duties assessment identifying key conflicts and mitigating controls. The admissions likewise undermined SoundHound's November 12, 2024 representation that it had completed implementation of an automated month-end and quarter-end accounting close workflow tool and its contemporaneous representation that there had been no material changes to ICFR during the third quarter of 2024.

69.     SoundHound and its senior executives repeatedly represented throughout 2024 that key remediation measures had been completed, that critical accounting-close controls had been implemented, and that no material changes to ICFR had occurred following the Amelia acquisition. SoundHound's March 2025 disclosures, together with the confidential witness allegations in the amended complaint filed in the Securities Class Action, revealed that those representations were materially false and misleading when made because the Company continued to suffer from the very control deficiencies it claimed to have remediated.

**THE SECURITIES CLASS ACTION MOTION TO DISMISS**

70.     On May 19, 2026, the Honorable Rita F. Lin of the United States District Court for the Northern District of California issued an order granting in part and denying in part the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

defendants' motion to dismiss the Securities Class Action. The court permitted claims based on several of SoundHound's representations concerning its internal controls and remediation efforts to proceed and likewise sustained the related control-person claim to the same extent. In permitting these claims to proceed, the court determined that the Securities Class Action plaintiffs had adequately alleged actionable misrepresentations concerning SoundHound's internal controls.

## DAMAGES TO SOUNDHOUND

71.     As a direct and proximate result of the Individual Defendants' misconduct, SoundHound has expended, and will continue to expend, significant sums of money.

72.     Such expenditures include, but are not limited to, legal fees associated with defending against the Securities Class Action and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, as well as payments of any fine or settlement amounts associated with the Company's violations.

73.     These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal controls with respect to financial reporting, public disclosures, and legal and regulatory compliance.

74.     These losses also include, but are not limited to, substantial compensation, bonuses and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

75.     As a direct and proximate result of the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties, SoundHound has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

76.     Plaintiff brings this action derivatively in the right of and for the benefit of SoundHound to redress injuries suffered, and to be suffered, as a direct and proximate result of

the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

77. SoundHound is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

78. Plaintiff is an owner of SoundHound stock and has been a continuous shareholder of Company stock at all relevant times.

79. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

80. The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

81. The Director Defendants (defined herein) either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

82. On June 22, 2026, Plaintiff, through Plaintiff's counsel, served the Demand on SoundHound's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing SoundHound to issue improper statements set forth herein. The Demand is attached hereto as Exhibit A.

83. As of the date of this complaint, Plaintiff has received no response to the Demand. Because Plaintiff is yet to receive any response from the Board of Directors regarding the Demand, despite allowing the Board a reasonable opportunity to investigate and act upon the allegations raised therein, Plaintiff considers the Demand to have been constructively refused. The Board's inaction and failure to communicate any determination concerning the Demand effectively constitute a rejection of the requested relief.

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

84. At the time the Board refused the Demand, the Board consisted of the following individuals: Defendants Mohajer, Hom, Sroka, Ball, and Marcus (the "Director Defendants").

85. The Board wrongfully refused Plaintiff's Demand and has failed to take any action to correct the breaches of fiduciary duty alleged in the Demand.

86. Although the Demand identified concrete claims, the individuals responsible for the alleged misconduct, the relief requested, and the publicly available evidence supporting those claims, the Board has neither acknowledged the Demand nor advised Plaintiff that it is undertaking any investigation. Nor has the Board requested additional information, sought an extension of time, identified any independent committee or counsel charged with evaluating the Demand, or provided any anticipated timetable for a response.

87. The Board has failed to provide any report or other response to the Demand. In failing to do so, the Company has neglected to provide any record of an investigation, meaning there exists no evidentiary record upon which to determine whether the Board refused the Demand in good faith.

88. The Board's decision-making to date is therefore not consistent with its obligation to determine in good faith whether the Demand's claims have merit and whether it would be in the Company's best interest to pursue them. Given this lack of good faith, the Board's lack of response to the Demand constitutes a constructive refusal of the Demand.

89. The Board did not act independently, nor reasonably, nor in good faith, on the basis of all reasonably available information by plainly disregarding the merits of the claims and allegations in the Demand.

90. For the foregoing reasons, the Board's refusal of the Demand falls outside of the protections of the business judgment rule. Plaintiff is therefore permitted to proceed and to prosecute this action derivatively on behalf of SoundHound.

## CLAIM I

### *Against the Individual Defendants for Breach of Fiduciary Duties*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

91.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.    Each Individual Defendant owed to SoundHound the fiduciary duty to exercise candor, good faith, fair dealing, and loyalty in the management and administration of SoundHound's business and affairs, particularly with respect to issues as fundamental as public disclosures.

93.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

94.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, including the duty to protect the rights and interests of SoundHound's shareholders.

95.    The Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report the Company's overall business, operations, and prospects.

96.    The Individual Defendants had actual or constructive knowledge that they caused the Company to engage in fraudulent schemes set forth herein and to fail to maintain adequate internal controls.

97.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed for the purpose and effect of artificially inflating the price of SoundHound's securities. As such, the Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of SoundHound.

98.    Four of the Individual Defendants engaged in insider sales during the Relevant Period while the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

26

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

99.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

100.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, SoundHound has sustained and continues to sustain significant monetary damages as well as reputational harm and damage to the share price of the Company's stock. Such damages include costs of defending the Company against the Securities Class Action and exposing the Company to millions of dollars in potential class-wide damages.

101.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

102.    Plaintiff, on behalf of SoundHound, has no adequate remedy at law.

### CLAIM II

*Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty*

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have encouraged, facilitated, and advanced their breaches of their fiduciary duties.

105.    In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the illegal conduct complained of herein.

106.    Plaintiff, on behalf of SoundHound, has no adequate remedy at law.

### CLAIM III

*Against the Individual Defendants for Waste of Corporate Assets*

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.    By failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused SoundHound to waste valuable corporate

27

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

assets. Specifically, the Individual Defendants have caused SoundHound to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products. Moreover, the Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

109. The issuance of false and misleading statements by the Individual Defendants was continuous, connected, and ongoing through the Relevant Period and resulted in continuous, connected, and ongoing harm to SoundHound.

110. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

111. Plaintiff, on behalf of SoundHound, has no adequate remedy at law.

## CLAIM IV

### *Against the Individual Defendants for Unjust Enrichment*

112. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, SoundHound.

114. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from SoundHound that was tied to the performance or artificially inflated valuation of SoundHound, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

115. Plaintiff, as a shareholder and a representative of SoundHound, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

116. Plaintiff, on behalf of SoundHound, has no adequate remedy at law.

**CLAIM V**

***Against the Individual Defendants for Abuse of Control***

117. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118. The Individual Defendants' misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

119. As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

120. Plaintiff, on behalf of SoundHound, has no adequate remedy at law.

**CLAIM VI**

***Against Defendants Mohajer and Sharan for Contribution Under Sections 10(b) and 21D of the Exchange Act***

121. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122. The conduct of Defendants Mohajer and Sharan as described herein has exposed the Company to significant liability under various federal securities laws.

123. SoundHound and Defendants Mohajer and Sharan are named as defendants in the Securities Class Action that alleges and asserts claims arising under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

124. The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing SoundHound securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments

29

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

was artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

125.    If SoundHound is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Mohajer and Sharan as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. SoundHound is entitled to contribution and indemnification from Defendants Mohajer and Sharan in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

126.    As officers and directors, Defendants Mohajer and Sharan had the power or ability to, and did, control or influence, either directly or indirectly, SoundHound's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

127.    Defendants Mohajer and Sharan are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

128.    Defendants Mohajer and Sharan have damaged the Company and are liable to the Company for contribution.

129.    As such, SoundHound is entitled to receive all appropriate contribution or indemnification from Defendants Mohajer and Sharan.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of SoundHound and that Plaintiff is a proper and adequate representative of the Company;

B.    Declaring that Defendants have breached and/or aided and abetted the breach of

30

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

their fiduciary duties to SoundHound;

C. Against all of the Defendants and in favor of SoundHound for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

D. Directing SoundHound to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect SoundHound and its shareholders from a continuation or repetition of the damaging events described herein;

E. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

F. Awarding SoundHound restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants, including profits obtained by insider sales;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 10, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/*Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Walter Fritz, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.


Dated: 8/10/2026

DocuSigned by:

*Walter Fritz*

3CC1DB9A2A7D4D6...

Walter Fritz

# Exhibit A



**The Rosen Law Firm**
I N V E S T O R   C O U N S E L

June 22, 2026

Phillip Kim
philkim@rosenlegal.com

<u>**VIA FEDEX**</u>

*TO THE BOARD OF DIRECTORS OF SOUNDHOUND AI, INC.*

The Board of Directors
SoundHound AI, Inc.
2093 Philadelphia Pike, #1968
Claymont, DE 19703

        **Re:**      <u>**Shareholder Demand on SoundHound AI, Inc.'s Board of Directors**</u>

Dear Directors of the Board:

We represent Walter Fritz (the "Shareholder"), who owns shares of common stock of SoundHound AI, Inc. ("SoundHound" or the "Company") and has continuously owned them at all relevant times.

We hereby demand that the Company's Board of Directors (the "Board") take action against certain current and/or former officers and directors of the Company, including, at least, Keyvan Mohajer ("Mohajer"), Nitesh Sharan ("Sharan"), James Hom ("Hom"), Diana Sroka ("Sroka"), Eric R. Ball ("Ball"), and Larry Marcus ("Marcus") (collectively, the "Officers and Directors") and any other individuals or entities that engaged in wrongdoing from March 1, 2024 through March 11, 2025, both dates inclusive (the "Relevant Period").

By reason of their positions as officers and/or directors of SoundHound, and because of their ability to control its business and corporate affairs, the Officers and Directors owed and owe SoundHound, and its shareholders, fiduciary obligations of good faith, loyalty, and due care. They were and are required to use their utmost ability to control and manage SoundHound in a fair, just, and honest manner and in compliance with all applicable federal, state, and local laws, rules, and regulations. Similarly, they were and are required to remain informed as to how the Company conducts its business and corporate affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiries in connection therewith, and take steps necessary to correct such conditions, policies, or practices, and make such public disclosures as necessary to comply with all applicable laws.

1

Shareholder Demand on SoundHound AI, Inc.'s Board of Directors
June 22, 2026

As explained below, the Shareholder believes that the Officers and Directors of SoundHound violated these fiduciary duties and/or aided and abetted such breaches of fiduciary duties and were unjustly enriched to the detriment of the Company. Accordingly, SoundHound must bring an action against them seeking damages and restitution. In addition, the Company must adopt corporate governance improvements immediately. The Shareholder reserves the right to supplement the following demands.

## I.   FACTUAL BACKGROUND

SoundHound is a technology company specializing in music identification, voice recognition, and natural language processing. The Company launched a mobile application in 2009 and later expanded into voice recognition and conversational AI functionalities through its Houndify Voice AI platform. As part of this process, SoundHound entered into partnerships with automotive manufacturers, smart-device providers, retail companies, and telecommunications companies in order to integrate its voice-recognition technologies into commercial products and services.

In 2024, SoundHound completed two significant acquisitions. On January 3, 2024, the Company acquired SYNQ3, a provider of voice-ordering systems for the food and beverage industry. In August 2024, the Company acquired Amelia Holdings, Inc., a conversational AI platform. SoundHound later touted these acquisitions as contributing to its "breakthrough year" in 2024 and "expanding [its] leadership position in voice and conversational AI."

*False and Misleading Statements Issued During the Relevant Period*

Throughout the Relevant Period, SoundHound and its senior executives repeatedly assured investors that the Company was actively remediating known material weaknesses in its internal control over financial reporting ("ICFR") while pursuing an acquisition-driven growth strategy. Although the Company disclosed that material weaknesses existed, it also represented in SEC filings that specific remediation measures had already been completed or implemented. Those representations were significant because SoundHound was simultaneously acquiring and integrating businesses whose financial results would be incorporated into its consolidated financial statements.

On March 1, 2024, SoundHound filed its Annual Report on Form 10-K for the year ended December 31, 2023 (the "2023 Form 10-K"), signed by Mohajer and Sharan and accompanied by SOX certifications from both executives. In that filing, SoundHound acknowledged material weaknesses in ICFR but represented that, as part of its remediation efforts, the Company had "[c]ompleted a segregation of duties assessment identifying key conflicts and mitigating controls."

SoundHound repeated the same representation in its Quarterly Report on Form 10-Q for the quarter ended March 31, 2024, filed May 10, 2024 (the "1Q24 Form 10-Q"), and again in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2024, filed August 9, 2024 (the "2Q24 Form 10-Q"). Each of those filings was signed by Mohajer and Sharan and accompanied by SOX certifications from both executives.

On May 9, 2024, during SoundHound's first-quarter 2024 earnings call, Chief Financial

2

Shareholder Demand on SoundHound AI, Inc.'s Board of Directors
June 22, 2026

Officer ("CFO") Sharan stated that "with our recent acquisitions, SYNQ3, now fully in the mix, the benefits of integrating this pioneering restaurant tech organization with our years of voice AI innovations are clear."

On August 8, 2024, SoundHound announced the Amelia acquisition in a press release titled "SoundHound AI Acquires Amelia, Significantly Expanding its Scale and Reach in Conversational AI Across New Verticals and Hundreds of Enterprise Brands." That same day, Chief Executive Officer ("CEO") Mohajer described the period as "a milestone quarter" and stated that Amelia would expand SoundHound's reach across new enterprise verticals. Sharan likewise described Amelia as "a key step towards harnessing the huge growth potential in conversational AI" that would help the Company "scale even faster." These acquisition-related statements underscore why SoundHound's internal controls and acquisition-accounting processes were critical to investors.

On November 12, 2024, SoundHound filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2024 (the "3Q24 Form 10-Q"), again signed by Mohajer and Sharan and accompanied by SOX certifications. In that filing, SoundHound repeated its representation that it had "[c]ompleted a segregation of duties assessment identifying key conflicts and mitigating controls."

The 3Q24 Form 10-Q also represented that the Company had "[c]ompleted the implementation of an automated month and quarter-end accounting close workflow tool to facilitate the review and support of key financial close process controls."

That statement was materially false and misleading. According to a confidential witness ("CW"),[1] CW2, who worked in Amelia's accounting organization from March 2018 through the acquisition and remained at SoundHound until March 2025, and CW3, who worked as an Amelia accountant before and after the acquisition, Amelia's accounting processes continued to operate manually after the acquisition. Both witnesses described SoundHound as leaving Amelia's accounting processes largely unchanged rather than integrating Amelia into an automated close workflow environment. CW3 further stated that Amelia lacked sufficient accounting personnel to close its books, while CW2 described significant deficiencies in review and oversight of accounting entries. These accounts directly undermine SoundHound's representation that it had completed implementation of an automated month-end and quarter-end accounting close workflow tool.

The 3Q24 Form 10-Q also stated that "[t]here were no changes in the Company's internal control over financial reporting. . ." during the quarter ended September 30, 2024 "that materially affected, or are reasonably likely to materially affect," the Company's ICFR. Mohajer and Sharan reinforced that representation through the SOX certifications accompanying the 3Q24 Form 10-Q, in which they certified that they had disclosed any change in SoundHound's ICFR that occurred during the quarter and materially affected, or was reasonably likely to materially affect, the

---

[1] Confidential witness allegations discussed herein are drawn from the Amended Class Action Complaint filed on October 1, 2025 in *St. John Family Trust, et al. v. SoundHound AI, Inc., et al.,* Case No. 3:25-cv-02915-RFL (the "Securities Class Action"). *See Securities Class Action*, ECF No. 56.

3

Shareholder Demand on SoundHound AI, Inc.'s Board of Directors
June 22, 2026

Company's ICFR.

That no-change statement and the related SOX certifications were materially false and misleading. During the quarter, SoundHound completed the Amelia acquisition and began incorporating Amelia's financial reporting into SoundHound's consolidated operations. Yet the 3Q24 Form 10-Q did not disclose that Amelia's accounting processes allegedly remained manual, inadequately staffed, and insufficiently integrated into SoundHound's control environment. The Company later admitted in the 2024 Form 10-K (defined below) that SoundHound, SYNQ3, and Amelia had not designed and maintained effective controls relating to substantially all accounts and disclosures and lacked effective controls over non-routine and complex transactions, including acquisitions.

Confidential witness allegations further support the conclusion that the Amelia acquisition materially affected, or was reasonably likely to materially affect, SoundHound's ICFR. CW2 and CW3 described continuing deficiencies in Amelia's accounting function, inadequate staffing, ineffective review controls, and manual close processes. Yet no corresponding disclosure regarding those internal-control changes appeared in the 3Q24 Form 10-Q. Because Mohajer and Sharan were responsible for evaluating ICFR and certifying the accuracy of those disclosures, the circumstances support a strong inference that they knew, or were deliberately reckless in not knowing, that the no-change statement and related SOX certifications were misleading.

*The Truth Emerges*

The truth began to emerge on March 4, 2025, when SoundHound filed a Notification of Late Filing on Form 12b-25 concerning its Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "2024 Form 10-K"). In that filing, SoundHound disclosed that it could not timely file the 2024 Form 10-K because "[d]ue to the complexity of accounting for the Acquisitions, the Company requires additional time to prepare the financial statements and the accompanying notes." The Company further acknowledged that the material weaknesses in ICFR that were previously disclosed "continue to exist as of December 31, 2024." These admissions revealed that SoundHound's control problems remained serious enough to delay its annual filing and were directly tied to the acquisition accounting that SoundHound had been required to perform.

On March 11, 2025, SoundHound filed the 2024 Form 10-K. That filing provided the first comprehensive disclosure regarding the extent of the Company's continuing control deficiencies and confirmed that the remediation efforts SoundHound had repeatedly described as completed had not eliminated the underlying material weaknesses. Specifically, SoundHound acknowledged that it "did not maintain an effective control environment" and lacked sufficient oversight of ICFR due to insufficient experience and training. The Company further admitted that, due to rapid business growth, changes to existing controls or the implementation of new controls were not sufficient to respond to changes in the risks of material misstatement to financial reporting. As a result, SoundHound had not designed and maintained effective controls related to substantially all accounts and disclosures.

Most importantly, the 2024 Form 10-K acknowledged that SoundHound lacked effective

4

controls over the identification and accounting for non-routine, unusual, or complex transactions, including acquisitions. The Company further admitted that it did not design and maintain effective controls to verify appropriate segregation of duties, including the assessment of incompatible duties, identification of incompatible assignments, and timely resolution of conflicts.

These admissions directly contradicted SoundHound's repeated statements in the 2023 Form 10-K, the 1Q24 Form 10-Q, the 2Q24 Form 10-Q, and the 3Q24 Form 10-Q that the Company had completed a segregation-of-duties assessment identifying key conflicts and mitigating controls. The admissions likewise undermined SoundHound's November 12, 2024 representation that it had completed implementation of an automated month-end and quarter-end accounting close workflow tool and its contemporaneous representation that there had been no material changes to ICFR during the third quarter of 2024.

The 2024 Form 10-K also revealed accounting errors relating to the Amelia acquisition. SoundHound disclosed adjustments correcting errors in the preliminary purchase-price allocation, including adjustments to contingent earnout consideration, accounts payable, accrued liabilities, deferred revenue, and deferred tax liabilities. The Company further disclosed that "[a]s a result of the adjusted acquisition-date fair value of contingent earnout consideration recognized, assets acquired and liabilities assumed, we recorded a decrease of $9.3 million to the goodwill recognized." These accounting corrections further demonstrate the consequences of SoundHound's failure to maintain effective controls over acquisition accounting and financial reporting.

SoundHound and its senior executives repeatedly represented throughout 2024 that key remediation measures had been completed, that critical accounting-close controls had been implemented, and that no material changes to ICFR had occurred following the Amelia acquisition. SoundHound's March 2025 disclosures, together with the confidential witness allegations in the amended complaint filed in the Securities Class Action, revealed that those representations were materially false and misleading when made because the Company continued to suffer from the very control deficiencies it claimed to have remediated.

*Post-Relevant Period Developments in the Securities Class Action*

On October 1, 2025, the plaintiffs in the Securities Class Action filed an amended complaint. Following briefing on SoundHound's motion to dismiss the amended complaint, the Court issued an order on May 19, 2026 granting in part and denying in part the motion to dismiss. Importantly, the Court sustained the core allegations that SoundHound made actionable misstatements concerning: (i) its repeated representations that it had completed a segregation-of-duties assessment identifying key conflicts and mitigating controls; (ii) its November 12, 2024 statement that it had completed implementation of an automated month-end and quarter-end accounting close workflow tool; (iii) its representation that there had been no material changes to ICFR during the third quarter of 2024; and (iv) the related SOX certifications executed by Mohajer and Sharan. In doing so, the Court concluded that plaintiffs had adequately alleged actionable securities-fraud claims based on those statements, including falsity and scienter. The Court also relied in part on the confidential witness allegations discussed above, particularly the accounts of CW2 and CW3 regarding Amelia's accounting processes and internal controls.

5

Shareholder Demand on SoundHound AI, Inc.'s Board of Directors
June 22, 2026

*        *        *

The statements issued in the Company's SEC filings and during the conference calls referenced above were materially false and misleading as they misrepresented and failed to disclose that, at the time the statements were made: (i) the Company had not completed a segregation-of-duties assessment identifying key conflicts and mitigating controls; (ii) the Company had not completed implementation of an automated month-end and quarter-end accounting close workflow tool; (iii) there had been material changes to ICFR during the third quarter of 2024; and (iv) the SOX certifications executed by Mohajer and Sharan falsely represented that all material changes in ICFR had been disclosed.

As a result of the misconduct described above, to date, SoundHound has been subjected to several lawsuits, including: (i) a consolidated federal securities fraud class action lawsuit brought against SoundHound, Mohajer, and Sharan, captioned *St. John Family Trust, et al. v. SoundHound AI, Inc., et al.,* No. 3:25-cv-02915-RFL (N.D. Cal.) (the "Securities Class Action"); and (ii) a consolidated derivative action filed on behalf of SoundHound against the Company's Officers and Directors, captioned *In re SoundHound AI, Inc. Stockholder Derivative Litigation*, No. 3:25-cv-03172-RFL (N.D. Cal.) (the "Derivative Action").

*        *        *

The breaches of fiduciary duties committed by the Officers and Directors are numerous and include:

*Issuing False and Misleading Statements.* The Officers and Directors knowingly or recklessly disseminated the foregoing materially false and misleading statements in the Company's SEC filings and communications to investors.

*Unjust Enrichment/Excessive Compensation.* The Officers and Directors have been unjustly enriched as a result of receiving bonuses, stock options, or similar compensation from the Company in light of their misconduct.

*Failure to Implement and Maintain Adequate Internal Controls.* In further breach of their fiduciary duties, the Officers and Directors caused the Company to fail to maintain adequate internal controls. Thus, in addition to engaging in the wrongful acts detailed herein, the Officers and Directors chose not to implement and/or maintain policies and procedures adequate and necessary to correct the false and misleading statements that had been issued and to prevent similar actions from occurring in the future.

*        *        *

*Damages*. The Company has been substantially damaged as a result of the Officers and Directors' breaches of fiduciary duty and other misconduct. As a direct and proximate result of the misconduct described herein, SoundHound has lost and expended, and will continue to lose and expend, many millions of dollars. Such expenditures include, but are not limited to, legal fees

6

Shareholder Demand on SoundHound AI, Inc.'s Board of Directors
June 22, 2026

associated with the Securities Class Action and the Derivative Action, liability in such lawsuits, and amounts paid to outside lawyers, accountants, and investigators in connection with any such lawsuits. Additionally, these expenditures include, but are not limited to, the unjust compensation and benefits paid to the Officers and Directors in light of their misconduct. SoundHound has further suffered and will continue to suffer a loss of reputation and goodwill as a result of the misconduct, and a "liar's discount" that will plague the Company's stock in the future.

## II. DEMAND

Our client demands that the Board commence a civil action against each responsible individual and entity and each responsible affiliate of SoundHound, including, at least, the Officers and Directors, to recover for the benefit of the Company. The Company must recover from the aforementioned individuals the amount of damages sustained by the Company as a result of their breaches of fiduciary duties. The Board must also assess whether any third parties should be sued, such as SoundHound financial advisors, auditors, or attorneys. SoundHound must also adopt corporate governance improvements immediately.

*        *        *

Please confirm receipt of this letter and the measures that the Board plans to take to address the harm inflicted upon SoundHound as a result of the conduct described herein. If, after receipt of this letter, the Board has not commenced action as demanded within a reasonable period of time, we intend to initiate litigation on behalf of the Company. We are willing to assist the Board as it conducts the investigation and will review and comment upon all reports and information generated in the course of its work.

If you have any questions, please do not hesitate to contact the undersigned counsel.

Very truly yours,

*Phillip Kim*
Phillip Kim

Cc: Luke Foley (lfoley@rosenlegal.com)

7